Littleton, Judge,
delivered the opinion of the court:
- In the petition by which this suit was brought plaintiffs pray judgment against the defendant for $69,967.46. Their revised claim now pressed is for $49,329.44 made up of the items classified and tabulated in finding 25. Of the total amount sought to be recovered the sum of $41,056.58 (items 1, 3, 4, and 7), represents the amount which plaintiffs seek to recover because of alleged delay resulting in alleged unnecessary costs and expenses caused by the alleged failure of defendant to furnish and deliver to plaintiffs certain structural steel when requested on September 6, 1934. This amount is made up of liquidated damages of $10,858.75 de *434 ducted from the amount otherwise due under the contract for delay by reason of plaintiffs’1 failure to complete the contract within the time agreed upon; $19,455.95, alleged unnecessary expense for charter hire and operating costs of a barge; $10,346.88, alleged unnecessary expense in 1935 of reconditioning the crib which was to constitute the foundation for the lighthouse structure; and $395, cost of repairs tc crib. The balance of the claim, in the amount of $8,272.86, is alleged to be due under the contract for work performed thereunder. This portion of the claim is made up of items 2, 5, and 6, listed in finding 25..
With the exception of the last three items of the claim mentioned, the claim is based entirely upon the allegation and contention that the defendant breached the contract by failing to furnish structural steel when requested, thereby causing delay and damages to plaintiffs in the completion of the contract, and that, for these reasons, no amount was deductible under the liquidated damage clauses of the contract and specifications, and that defendant should compensate plaintiffs for damages resulting from alleged unnecessary costs and expenses. From the facts disclosed by the record and upon a proper interpretation of the contract between the parties and the specifications forming a part thereof, we are clearly of opinion that plaintiffs are not entitled to recover any amount on or in connection with the first portion of their claim of $41,056.58 above mentioned. Plaintiffs allege and repeatedly emphasize throughout their testimony, and their requested findings and brief, that their plan of operation was to tow the crib to the site, submerge it by the use of crushed and conveyor stone, then erect the structural steel columns and framework thereon and establish within this structural framework a camp site for their force, and construct platforms therein for their materials and concreting equipment for filling the 24 outer pockets around the perimeter of the crib with concrete by the tremie process; that the inability of the defendant, because of the strike, to deliver the structural steel when requested on September 6,1934, disrupted their plan of operation, causing it to be abandoned, and that, as an alleged direct result, they were delayed in the prosecution of the work and relieved of liability for liqui *435 dated damages under the contract and were otherwise damaged in the total amount of $41,056.58 as hereinabove mentioned.
While plaintiffs may have intended to pursue this plan of operation, we are of opinion, first, that the contract and specifications agreed upon and entered into by the parties did not contemplate or provide that the work be carried on in this manner so as to relieve- plaintiffs of liability for liquidated damages for delay or to entitle them otherwise to recover, as damages, costs and expenses necessary to be incurred in performing the work called for by the contract; second, that the contract and ¡specifications contemplated and provided that when the crib had been submerged by the weight of the crushed and conveyor stone to be used for that purpose the 25 central pockets of the crib would be filled with crushed stone and the 24 outer pockets would be filled with concrete before installation and erection of the structural grillages, columns, and framework; third, that the contract and specifications did not specify or contemplate that the defendant would deliver the ¡structural steel on any date prior to the complete sinking of the crib in the manner last above mentioned, and the fact that plaintiffs’ contemplated plan of operation may have been temporarily disrupted did not, in view of the contract provisions and the facts and circumstances disclosed by the record, relieve plaintiffs of the liquidated damages deducted for delay in completing the contract or render the defendant liable for any portion of the expenses incurred, and necessary to be incurred by plaintiffs, and sought to be recovered. If plaintiff^ suffered any delay and expense because of the steel, the cause for nondelivery was beyond the control and without the fault of defendant. In any event the defendant had a reasonable time after the steel was requested within which to deliver it at the designated point which, if plaintiffs had been entitled under the contract to demand the steel at the time they did, would have been not earlier than September 15, and if the period from that date to November 1 were excluded plaintiffs would nevertheless be liable for the full amount of liquidated damages charged and deducted. The steel was delivered early in December 1934. Fourth, *436 that the contract provided that no work would be required thereunder and plaintiffs would not be charged with time during the period November 1,1934, to May 1, 1935, and the evidence fails to show that if plaintiffs had received the structural steel on September 5 or 15, any of the delay of which they complained would have been avoided or that they could have erected the steel with the equipment they had, under the weather conditions obtaining, and filled the 24 outer pockets with concrete in accordance with their contemplated plan of operation without incurring the expense of which they complain, and which they seek to recover as damages; fifth, that plaintiffs’ troubles and difficulties were more directly attributable to the fact that plaintiffs were inexperienced in lighthouse construction work at such an exposed location as was the structure to be built under the contract in suit, that they started out and continued an attempt to carry on the work called for by the contract with inadequate and insufficient equipment and that, after they had received from the contracting officer on August 8, 1934, notice to proceed and speedily prosecute and carry on the work, they lost about 23 days of the most favorable and valuable time of the contract period of 75 days within which they agreed to complete the entire work at the site of the lighthouse structure as called for by the contract. Sixth; that when plaintiffs requested of the supervising engineer, who was the authorized representative of the contracting officer near the site of the work, that they be furnished the structural steel, the contracting officer did not at that time or at any other time agree that the United States was obligated under the contract to furnish the steel at that time, although the contracting officer and his representative were at all times anxious and willing to do everything they could to aid plaintiffs in advancing the work and completing the same within the shortest practicable time. Accordingly, when it was found that due to a strike which probably would not be settled in time for delivery of the structural steel during the period up to November 1, 1934, in which the contract contemplated that the work would be carried on (the contract time for the performance of the whole work as agreed upon expired on *437 October 27, 1934), the defendant’s supervising engineer offered, without expense to plaintiffs, to furnish and deliver to them on the crib sufficient wooden 12" x 12" and 2" x 12" timbers to be used for erection on the crib by plaintiffs of a temporary framework as a substitute for the structural steel framework, in order that plaintiffs might be able to proceed in accordance with their plan of operation. This arrangement was agreed to and approved by plaintiffs by Herman Greiling, the principal member of the partnership. In addition to the timber mentioned, the defendant agreed to furnish and deliver the necessary bolts, etc., for its erection on the crib. The defendant did supply and deliver to the crib, with its own ship, the timbers, bolts, etc., and a part of it was unloaded on the crib on September 12. All the material was not then unloaded-at the request of plaintiffs. The balance of the timber was made available to plaintiffs when needed. No more of the timber was delivered by defendant because the plaintiffs, by reason of weather conditions, abandoned the arrangement to erect the timber framework and platform for the purpose of continuing with their desired plan of establishing a camp site in the upper portion thereof and placing within the structure their material and concrete equipment for the purpose of filling the outer pockets of the crib with concrete by the tremie process before closing down work until the following spring. It was perfectly obvious long before the plaintiffs requested delivery of the steel that they would not be able, because of delay, and with the equipment they had, to complete within the working season of 1934 any substantial portion of the work called for before the expiration date of the contract period. Seventh, that the contracting officer under the terms and provisions of the contract could have decided at the time plaintiffs requested the steel that the structural steel framework should not be constructed until the outer pockets of the crib had been filled with concrete and that 'plaintiffs should first proceed to perform that portion of the work. Plaintiffs were not then, nor subsequently, able with the equipment which they had on hand to complete the filling of the outer pockets of the cribs with concrete during the available working *438 time. When, plaintiffs made claim to the contracting officer for remission of liquidated damages and alleged unnecessary expense incurred by reason of the alleged failure to furnish the steel, the contracting officer and. the head of the department, in deciding the dispute, held that plaintiffs were not actually delayed in the proper prosecution of the work by failure to receive the structural steel when requested, and that the contract and specifications contemplated and provided that the 24 outer pockets of the crib should be filled with concrete before the structural steel was erected. These decisions were correct. Eighth, that in any event plaintiffs would be liable for the full amount of the liquidated damages deducted and retained by the defendant for delay in completing the contract for the reason that the work called for was not completed until 676 days beyond the period agreed upon and 257 days after the allowance of all excusable delays to which plaintiffs were entitled. Under the terms of the contract and specifications only about 97 days of inexcusable delay by plaintiffs would have required the deduction and retention of the full amount of liquidated damages which were deducted and retained under the contract. Ninth, the structural steel was delivered by the defendant at plaintiffs’ base of operations in December 1934, and when plaintiffs resumed operations on May 15, 1935, they did not use and erect the structural steel for the purpose of providing a camp site and working platforms on the crib, for the purpose of filling with concrete the remaining fifteen unfilled outer pockets of the crib, as they insist they had contemplated and planned, but this work was performed by placing the concrete equipment and materials on the center portion of the crib. There was no reason why this method could not have been more easily and effectively employed in 1934. The erection of the structural steel was commenced June 15, 1935, and was completed early in August. Tenth, that after final completion of the work September 2,1936, the contracting officer and the head of the department granted plaintiffs a hearing upon their claims for remission of liquidated damages and reimbursement for alleged unnecessary expense due to failure of the defendant to deliver the structural steel when re *439 quested, and, from tbe facts disclosed and found and upon tbe provisions of tbe contract and specifications, the contracting officer and tbe head of tbe department decided that plaintiffs were not entitled to payment on any items of this portion of their claim, or any portion thereof. Their decisions were not only not arbitrary or so grossly erroneous as to imply bad faith, but in our opinion they were correct.
The foundation of the lighthouse structure called for by the contract consisted of a large pier 64 ft. square and' 27 ft. deep, consisting of 27 courses of 12" x 12" timbers as a frame being divided by similar timbers into 49 pockets, 24 of which were disposed around the outside edges of the crib and 25 within the center area thereof. The crib itself was constructed by the defendant and was designed to float at such depth, with the steel ice plating at the water line and at the outside of the crib, in position so that it could be towed' directly to the prepared site for the lighthouse structure, and the specifications required that the crib be sunk to the ground at the bottom of the lake on the site by placing ■certain crushed stone in the 25 central pockets and certain large stones on top of the crib. The specifications provided that immediately following the sinking of the crib in this manner and the placing of some small crushed stone in the bottom of the outside pockets for the purpose of leveling the crib, the 25 central pockets should be completely filled with crushed stone and the 24 outer pockets should immediately be filled with concrete placed by the tremie process. Upon so filling these outer pockets, steel grillages were to be placed to support the steel columns and framing of the superstructure and a slab of reinforced concrete 6 feet thick placed over the entire area of the crib after the steel grillages, columns, and'framework had been erected. The pier foundation! was to be protected by rip rap stone placed outside of the crib on all sides, this protection being provided for under a separate contract. This general type of pier construction had become more or less standard on the Great Lakes, having been used at more than seven sites. On top of the reinforced 6-foot concrete slab was to be constructed the pier *440 proper, of concrete and steel 21 '6y2" above the top of the crib, and on top of this the fog signal building of steel and masonry. The entire structure from the top of the crib foundation is illustrated and shown on drawing 34030-1 and the crib details are shown on drawing 34030-5. The.-25 central pockets of the crib were provided at the bottom of the crib with a 6" x 12" plank grillage. All the pockets of the crib were 27 feet deep. The 24 outer pockets of the crib, with the exception of the four corner pockets, were 5' 6" by, approximately, 8', and the four corner pockets were 5' 6" square.. The specifications, on which plaintiffs- contend they base their contemplated plan of operation, were prepared in considerable detail and in arrangement and language from beginning to end indicate and show the sequence of operations intended to be carried on in the performance and construction of the work called for. The specifications first designated the site and the depth of the water thereat and then listed the drawings for the entire structure. Then followed the provision as follows:
As stated in the Schedule, page 2, paragraph H, it is desired that the work covered by this General Construction Contract shall be completed within 75 calendar days, or sooner if practicable. . Bidder, state on Schedule'at place indicated, Time, Calendar Days, required for completion after order to proceed.
Note. — In ease the construction period should extend past November 1, 1934, the winter period November 1, 1934, to April 30, 1935, shall be exempt in computing calendar days required by contractor to complete the work.
Before plaintiffs submitted their bid on August 2, 1934, this quoted provision, together with, certain other provisions of the specifications not material here, was amended, and the-plaintiffs were furnished with the changed and amended provision on July 27, 1934, as follows:
The specifications are hereby changed as follows:
Deferring to Specifications, Common Clauses, Page 2, Paragraph 3, as stated,'it will be very desirable that the work at each station shall be completed within 75 calendar days, and in case weather conditions prove favorable, it is believed that contractors will be able to accomplish substantial completion of the main body of the work within that time, or in any event, not over *441 90 days, with distinct advantage to their own interests, avoiding the possibility that the work would have to be suspended over the winter period (time exempt November 1st, 1934, to April 30, 1935) and resumed in the Spring.
However, to avoid the possibility that seventy-five days may prove to be an unreasonable requirement in case weather, wind, and sea conditions should prove unfavorable, the time requirement is hereby changed from 75 days to 120 days, with the exempt period same as stated Page 2, Paragraph 3 “Note” November 1, 1934, to April 30, 1935.
In comparing bids for award of' contract, the requirements of Schedules, Page 2, Paragraph I will be followed in considering the time for completion offered by the several bidders. . ,. ;
The structure shall be completed up to top of the main six-foot concrete slab and all of the riprap shall be placed in any event, before suspending work for the winter, in case such suspension should'' prove necessary.
The plaintiffs in their bid of August 2, 1934, signed by Herman Greiling, on Schedule A, page 4, offered and agreed to furnish all material and labor and construct Grays Eeef- Light Station, all as shown by the plans and described by the specifications, for the sum of $108,587.50 and to complete the same within “75 calendar days after order to proceed.” In making their bid, plaintiffs accepted and agreed to the terms and conditions of the proposed contract and the specifications submitted and agreed to execute a written contract embodying the same. C. H. Hubbard, Superintendent of the 12th District.Lighthouse Service, Department of Commerce, was the contracting officer acting for and on behalf of the defendant and neither the award of the contract nor the agreement entered into by the plaintiffs was required to be approved by any other official in order to become binding. Plaintiffs’ bid, although not the lowest in amount of money, was the lowest on the basis of evaluation provided in the proposal and Schedule A because of the fact that plaintiffs agreed to complete the work within 75 calendar days whereas the only other bidder offered'to ^complete the work in 120 calendar days. Schedule A of the proposal provided that for the purpose of com *442 parison of bids the time for completion offered by bidders would be evaluated at the same rate as stated in the specifications under the paragraph relating to liquidated damages, and the liquidated damage provision specified about $111.59 a day for delay.
The specifications then proceed in paragraph 4, entitled “Camp Facilities,” to state as follows:
Especially in connection with the Grays Reef work, because of its very remote and inaccessible location, it appears that it will be necessary for contractor to provide a camp for quartering and caring for. working force. It would appear that the use of floating plant which can be kept “on the job” nearly continuously, suitable for the provision of quarters would be necessary.
In case contractor desires he may use the old steel building and tower at the old abandoned Waugoshance ■ Lighthouse, located about 4 miles northeasterly. It would be quite practicable to establish a camp right at the site in the upper story of the steel building, soon after the sinking of the crib and the erection of the steel.
It will be noted from the above that the specifications are speaking only with reference to quarters for the working force and warns the bidder to whom a contract may be awarded for the Grays Reef Lighthouse that because of the very remote and inaccessible location of the work it would be necessary for the contractor to provide a camp for quartering and caring for his working force and that the use of a floating plant which could be kept on the job nearly continuously and suitable for provision of quarters would be necessary. The bidder and prospective contractor was then advised that if he should become the contractor he might use the steel building and tower of an abandoned lighthouse about four miles from the site of the work to be performed. It is suggested with reference to a camp site only that it would be practicable to establish a camp right at the site in the upper story of the steel building soon after the sinking-of the crib and the erection of the steel.
' There is clearly nothing in the language of this paragraph of the specifications that suggested the erection of steel be *443 fore the pouring of 24 outer pockets, nor any language which obligated the defendant to furnish the structural steel at any particular stage of the work, or any language that would entitle plaintiffs to bind the defendant by any plan of operation not strictly in accordance with other provisions of the specifications. The words “soon after the sinking of the crib,” in the second .paragraph above quoted, if it could be held that they constituted anything other than a mere suggestion to the contractor, must be interpreted in the light of other and later provisions of the specifications relating to the complete sinking of the crib by filling all pockets and erecting a steel superstructure thereon.
The next paragraph, 5 of the specifications, related to the establishment of a light and fog signal at the site in the event of removal of the neighboring Light Ship. Paragraph 6, entitled “Timber Crib,” referred to certain subsequent special clauses relating to Grays Beef Lighthouse and proceeded to describe and specify the details of the timber crib. Paragraph 7 also related to the crib and was entitled “Securing bottom eorm timber to upper part oe steel plate” as shown on sheet 7 of the drawings. This had nothing to-do with the structural steel. Paragraph 8 related to “Rep rap stone about grxb”; paragraph 9 related to “Small rep rap stone” ; paragraph 10 related to “Large rip rap stone” ; paragraph 11 was as follows :
“Stone for pilling 25 center pockets op crib.”
Shall be 7" “furnace” or “conveyor” stone (hard limestone or other stone of similar characteristics), or “one man” size stone. The filling stone shall carry a mixture of crushed stone, quarry spalls, or gravel in ap- ■ proximate graded sizes sufficient to reduce the voids to about 20% and insure the filling of the pockets compactly and-give the crib maximum weight.
(See paragraph 16 — “Sinking crib and filling with stone.”)
Paragraph 12 related to “Crushed stone or gravel for sealing the bottom op crib” ; paragraph 13 related to “Gravel ítll for basement,” and paragraph 14, entitled “Towing crib to site and anchoring,” provided as follows:
Contractor shall provide ample towing power in tug or tugs employed to tow the fabricated crib to site and *444 shall provide an ample number of heavy anchors with mooring lines or cables stored on convenient platforms • above top of steel protection plate or otherwise arranged for convenient use in case of emergency, so that by no possibility shall the crib be lost or damaged in case of sudden Storm or other emergency.
Sinking of crib shall not be attempted unless there is actually on hand, ready to use, the full amount of stone to fill the 25 central pockets.
Plaintiffs complied with this paragraph but they did not tow the crib to the site until September 1, 1934, 18 days after they had been given notice and ordered to proceed. Paragraph 15 entitled “Leveling bottom eoR cbib”, set forth in finding 8, contained directions for submerging the crib in such manner as to bring the crib in' contact with the bottom of the lake with the top of the crib at the desired level.
. The next two paragraphs, 16 and 17, of the specifications are important in connection with the items of the claim of plaintiffs now under consideration. They relate to the sinking of the crib. Paragraph 16 entitled “Sinking cbib AND eilliNG with stone” is set forth in finding 8, and paragraph 17 is as follows:
Filling 24 outee fockets of cbib with conceete THRU tremie, — (Approximately 1,485 cu. yds. tremie concrete, more or less, for Grays Beef.)
Immediately following the sinking of the crib by the filling of the 25 inner pockets with stone, the 24 outer pockets of crib shall be filled with concrete, placed in the water-filled pockets thru a tremie pipe.
• Before the placing of the concrete under water is started, each pocket shall be inspected by diver to make , certain-that the* pockets- are-tight -against leakage of concrete. To insure such tight condition, deposit gravel or crushed stone in each pocket in sufficient miuimnm amount as will insure such tightness and also deposit gravel or crushed stone about outside of crib wall and bank up against wall, if necessary, to make certain that concrete is retained in pockets. See paragraph No. 16.
It is suggested that the bottom of each pocket then be sealed with about 3 cu. yds. of concrete placed by bottom dumping bucket having blanketed top, lowered to bottom and dumped in each pocket. The pockets then to be filled approximately as described below.
*445 Each pair of pockets then to be filled with concrete, poured through a pipe tremie of proper size appropriate to the size of mixer. .In starting the pouring operation through tremie, proper precautions shall be exercised to prevent the washing of the initial charge and once started tremie shall be kept continuously full and lower end well bedded into concrete fill to insure the slow and continuous filling with concrete under pressure and without serious washing out of cement.
It is believed that each group of 3 pockets can be filled through a single tremie pipe by keeping the tremie in the center pocket.
Care shall be exercised that the filling operation shall not be so fast as to produce dangerous pressures on walls of crib. In case mixer is of such large size as to make filling too rapid, then two or more tremies shall be used working with additional pairs of pockets. The concrete poured thru the tremie shall be mixed to such consistency as will insure the best concrete in place under water, should be not quite moist enough to be plastic. If mixed too wet this charge is likely to be lost — if too dry the chute will be choked.
On completion of concreting of a group of 3 pockets, the steel reinforcing dowels shown on plans shall be inserted in top when the concrete has hardened sufficiently to sustain the weight of dowels at proper height.
We think it is obvious from the language of these specifications that the crib was not to be regarded as completely sunk for the purpose of erecting thereon the structural steel framework until all the pockets of the crib had been filled with crushed stone and concrete as specified. Moreover, paragraph 1Y clearly and specifically provided that “immediately following, the sinking of the crib” by the filling of the 25 inner pockets with crushed stone, the 24 outer pockets of the crib should be filled with concrete. We think, therefore, there is no justification for plaintiffs’ contention that the specifications provided and authorized them to adopt and insist upon a plan of operations for the erection of structural steel immediately upon sinking the crib and filling the 25 inner pockets with crushed stone before they had placed any concrete in the 24 outer pockets of the crib. This conclusion is further supported by reference to subsequent provisions of the specifications having to do *446 with the construction of the superstructure upon the crib pier foundation. Plaintiffs’ contention is, in effect, that they had a right under the specifications to insist upon a plan of operation which would permit them to erect a part of the superstructure before they had completed the foundation. The greater weight olf the evidence ,'of record is that while this method of operation might be possible it was impractical and was not the usual, customary, and most practical way of carrying on the work of constructing lighthouse structures of this character.
The next paragraphs, 18 to 24, inclusive, of the specifications related to concrete materials, and paragraphs 25 and 26, upon which plaintiffs mainly, rely in support of their claim for $41,056.58 made up of the items now under consideration, are quoted in finding 11:
• The top of the crib as filled with crushed stone and concrete was datum 578.5. On top of this was to be constructed a 6' thick concrete “main slab”; 8' 7%" above the top of this main slab in the steel framework came the “storage room floor” which was 9' 7%" above the top of the crib; above this 7' %" was the “machinery room floor” which was 16' 10% " above the top of the crib. 10' above this point came the “main deck,” concrete slab 4" thick. The main deck, mentioned in paragraph 25 was 21' 6%" above the top of the crib. At the main deck the drawings show a set-back of about 16' and then the tower of the lighthouse structure begins, and 5' 10%" above the main deck floor is the floor of the living-room quarters for the lighthouse keeper, which •is 26' 10%" above the crib. From this it will be seen while paragraph 26 of the specifications indicated that -plaintiffs might construct a temporary camp at a certain elevation, and paragraph 25, supra, indicated plaintiffs might place their concreting plant in the upper portions-of the steel framework, there is. nothing. in paragraph 25' or 26 which will support the conclusion that these paragraphs contemplated that plaintiffs should or might erect the structural steel framework before completely filling the 24 outer pockets of the crib with concrete before. erecting in the upper stories of the steel framework their concreting plant *447 and platforms for the storing of materials for the purpose of filling the 24 outer pockets of the crib with concrete. If plaintiffs in making their bid planned to carry on the work of constructing the lighthouse in the maimer in which they contend, they were not supported or justified therein by any provision of the specifications. Accordingly, plaintiffs are not entitled to hold the defendant responsible for damages by reason of the inability of the defendant, because of the strike at the steel plant, to deliver to plaintiffs the structural steel at the time they requested .it on September 6, 1934.
The facts set forth in the findings show that when plaintiffs resumed operations May. 15, 1935, they did not proceed in accordance with their alleged original plan but mixed and placed the concrete necessary to fill the outer pockets of the crib with concreting equipment and materials placed over the central area of the crib which had been filled with crushed stone. The pockets in this area had been so filled at the time they requested the defendant to deliver the structural steel September 6, 1934. Plaintiffs did, as we think the specifications contemplated and provided, place their concreting equipment and material in the upper portions of the structural steel framework erected after the outer pockets were poured for the purpose of pouring the additional concrete called for by the contract. Although the steel was available when plaintiffs resumed operations May 15, 1935, its erection was not commenced until about June 15 and was not completed until early in August.
The facts further establish that the contracting officer and the head of the Department considered plaintiffs’ claims for remission of the amount deducted and withheld for the delay and the alleged unnecessary costs and expenses not contemplated by the contract, and made findings of fact and denied the claims making up the amount of $41,056.58 now under consideration and also item 5, finding 25, for $1,470 (see finding 22). The record fails to show that these* findings and decisions were arbitrary or so grossly erroneous as to imply bad faith. Under articles 9 and 15 of the contract these decisions were therefore final and conclusive. *448 Accordingly, plaintiffs are not entitled to recover any amount under items 1, 3, 4, 5, and 7 of their claim as set forth in finding 25.
The remaining amount of the claim, items -2 and 6, finding 25,- is $6,802.86. Included in item 6, totaling $1,311.51, is the amount of $221.99 for certain crushed stone washed out of the crib during the winter of 1934, as set forth in finding 17. Plaintiffs concede that if they are entitled to recover on this claim, the amount of $221.99 is correct. We are of opinion, however, that plaintiffs are not entitled to recover on this item for the reason as hereinbefore stated, and as found by the Secretary of Commerce, that the responsibility of protecting the crib for the winter months was that of the contractor and that the Government was not required under the facts and contract provisions to reimburse plaintiffs for the cost of any crushed stone that may have been washed out of the crib between the time they ceased operations in November 1934 and commenced operations in May 1935.
With reference to the remainder of the claim amounting to $6,580.87, being the entire amount of item 2, and $1,089.52 of item 6, finding 25, the record shows, and we have found as a fact, that in the findings and decision of the Secretary of Commerce on appeal, -the amounts of these items of the claim were allowed, but that inasmuch as the work called for by the contract had theretofore been completed on September 2,1936, and the final payment for the amounts then considered to be due had then been made by the contracting officer, the findings and decision on appeal were sent to the Comptroller General June 25, 1937, for direct settlement. Inasmuch, however, as plaintiffs had theretofore on May 5,1937, instituted suit in this court, no payment was made.
Plaintiffs are therefore entitled to recover $6,580.87 and judgment in their favor will accordingly be entered. It is so ordered.
Green, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.